Cite as 2022 Ark. App. 338

# ARKANSAS COURT OF APPEALS

DIVISION II

No. CV-20-394

| | |
|---|---|
| BAUCUM FULK<br>          APPELLANT/CROSS-APPELLEE<br><br>V.<br><br>MARION FULK; MARTIN FULK; AND<br>AUSTIN FULK<br>          APPELLEES/CROSS-APPELLANTS | Opinion Delivered September 21, 2022<br><br>APPEAL FROM THE PULASKI<br>COUNTY CIRCUIT COURT,<br>THIRTEENTH DIVISION<br>[NO. 60PR-19-703]<br><br>HONORABLE W. MICHAEL REIF,<br>JUDGE<br><br>AFFIRMED ON DIRECT APPEAL;<br>AFFIRMED ON CROSS-APPEAL |

**RAYMOND R. ABRAMSON, Judge**

This is an appeal from a probate proceeding involving a dispute between the four children of the late Augustus "Gus" Marion Fulk and his wife Anne. The primary dispute concerns ownership of Gus's stock in the LaGrue Land and Irrigation Company ("the Duck Club"), a hunting club that has profitable farmland as well. The surviving children are a daughter, Marion; and three sons, Martin, Baucum, and Austin. On April 1, 2019, Marion, Martin, and Austin filed a petition for probate of will and appointment of executors in the probate division of the Pulaski County Circuit Court. Although Gus's will named Baucum as executor, the petitioners asked that Marion and Martin be named as co-executors instead; they argued that Baucum was unsuitable for the position because of his conduct in convincing Gus to convey the Duck Club stock to him before their father's death. Four months later, Marion,

Martin, and Austin filed a petition to have that Duck Club transfer set aside on the grounds of incapacity and undue influence.

Following a bench trial, the circuit court admitted Gus's will to probate and appointed Baucum as executor, but set aside the Duck Club stock transfer to Baucum, finding that it was the result of incapacity and undue influence. Baucum filed the instant appeal from the circuit court's ruling setting aside the transfer; and the other three siblings filed the instant cross-appeal from the circuit court's appointment of Baucum as executor. We affirm on both direct appeal and cross-appeal.

On January 18, 2019, eighty-seven-year-old Gus executed an affidavit of lost stock (the "Affidavit") conveying stock that he owned in the Duck Club to his son, Baucum. Present were Gus, Baucum, William "Hank" Griffin III (a family friend), and Anna Swallow (Baucum's girlfriend). Testimony established that following the death of Gus's wife, Anne,'s death, on December 31, 2016, Gus's mental and physical health began to deteriorate significantly. He was diagnosed with Alzheimer's-type dementia in 2017 and eventually came to reside in a senior living community in Pulaski County where he received around-the-clock care and supervision.

Gus had executed a general durable power of attorney, appointing Marion and Baucum as his attorneys-in-fact on December 3, 2018. This was drafted by Gus's long-time estate-planning lawyer, Christopher Rogers. It required that any gifts made under its authority to Gus's descendants must be made equally to all descendants of the same generation and class. Rogers had also previously prepared estate plans for Gus and Anne. He prepared their wills as well as the Fulk Family Revocable Living Trust dated November 24, 1994 ("the Trust"). The Fulks' estate plan employed pour-over wills, which provided that upon their deaths, any of their (Gus's

2

and Anne's) assets that were outside of the Trust would be transferred into the Trust. The Trust also provided that its assets would then be divided equally between their four children.

In 2017, Marion began working with Rogers to transfer assets into the Trust pursuant to memos of instruction that he gave her. Consistent with the instructions she received from Rogers, in July 2018, she asked the Duck Club's officers to list a transfer-on-death clause on Gus's Duck Club stock certificate providing that the stock would be transferred to the Trust upon Gus's death, but they apparently took no action on her request. Baucum emailed Rogers in December 2018, claiming that Gus wanted Baucum to inherit his ownership interest in the Duck Club. This initiated a round of emails between Rogers and Baucum's siblings in which the siblings took the position that Gus's estate plan should not change, and the Duck Club stock should be transferred into the Trust with the rest of Gus's assets.

Gus initially purchased 8 and 8/11 shares of stock in the Duck Club on June 29, 1983. Testimony presented established that Baucum also hunted at the Duck Club and enjoyed it for many years. On January 18, 2019, Baucum picked up Gus from Woodland Heights, the senior living center where he resided, and took him to lunch, where Baucum presented him with the prepared Affidavit. The Affidavit averred that Gus had lost the stock certificate for his Duck Club shares and authorized the president and secretary of the Duck Club to cancel his lost certificate and transfer his shares of stock to Baucum. Baucum then took Gus to a notary, and Gus signed the Affidavit. The day after he signed the Affidavit, Gus went to a hospital emergency room and was admitted to the intensive care unit, where he remained for nearly a week.

After his release, he had no recollection of his hospitalization and frequently did not know where he was or what day it was. Roughly five months before procuring Gus's signature

on the Affidavit, Baucum remarked in an email to his siblings that Gus "has utterly ceased to be able to connect cause and effect." Gus died two months after signing the Affidavit.

On direct appeal, Baucum argues that he sufficiently rebutted the presumption that the Affidavit resulted from Gus's lack of capacity or Baucum's undue influence. We disagree. Arkansas appellate courts do not reverse decisions of probate courts unless they are clearly erroneous, but they do review legal rulings de novo. *See Edwards v. Hart*, 2020 Ark. App. 182, at 5, 598 S.W.3d 543, 545–56. In conducting its review, an appellate court must give "[d]ue deference . . . to the superior position of the probate judge to determine the credibility of the witnesses and the weight to be accorded their testimony." *See Medlock v. Mitchell*, 95 Ark. App. 132, 135, 234 S.W.3d 901, 904–05 (2006).

"Ordinarily, the party challenging the validity of [an instrument] is required to prove" incapacity or undue influence "by a preponderance of the evidence." *See Harbur v. O'Neal*, 2014 Ark. App. 119, at 5, 432 S.W.3d 651, 656. However, when the assignee procured the assignment and had a confidential relationship with the assignor, this gives rise to a rebuttable presumption of incapacity and undue influence. *See Montigue v. Jones*, 2019 Ark. App. 237, at 16, 576 S.W.3d 46, 56. To rebut this presumption, the party defending the assignment bears "the burden of proving beyond a reasonable doubt that the testator enjoyed both required mental capacity and freedom of will." *See Harbur*, 2014 Ark. App. 119, at 5, 432 S.W.3d at 656. We have long held that "[d]ue deference will be given to the superior position of the probate judge to determine the credibility of the witnesses and the weight to be accorded their testimony." *Medlock*, 95 Ark. App. at 135, 234 S.W.3d at 904–05.

4

On appeal, Baucum argues that the witnesses who were present on January 18, 2019, all testified that Gus was mentally competent and understood that he was conveying the Duck Club stock to Baucum and that there was no undue influence. He specifically cites the evidence of Gus's condition during the precise moment he decided to sign the Affidavit. We agree that the issue "is not the mental capacity of the testator before or after a challenged [instrument] is signed, but rather the level of capacity at the time the [instrument] was signed." *Pyle v. Sanders*, 344 Ark. 354, 360, 39 S.W.3d 774, 778 (2001). We also acknowledge that this court has held that a person who might occasionally lack capacity may nevertheless make a valid execution of an instrument "during a lucid interval." *Green v. Holland*, 9 Ark. App. 233, 236, 657 S.W.2d 572, 575 (1983). But in light of our deferential standard of review, we agree with Marion, Martin, and Austin that this does not mean that when all the witnesses to an instrument's execution have an interest in seeing it upheld, a finder of fact must simply accept their self-serving testimony at face value and throw out all other relevant evidence and common sense.

Instead, the circuit court had an obligation to consider all the relevant evidence, which is what it did. "Undue influence on a testator may be inferred from the facts and circumstances." *Medlock*, 95 Ark. App. at 137, 234 S.W.3d at 905. A court may consider whether a signatory was hospitalized or in a weakened state. *Pyle, supra*. A court may also consider whether the person who stood to benefit from the instrument's execution was "the driving force behind the changes" or present when the changes were discussed with the signatory and executed. *See Medlock*, 95 Ark. App. at 137, 234 S.W.3d at 905–06. Further, when the party defending the instrument "relies almost exclusively on the testimony of" individuals whose self-interest aligns with his own,

5

then the circuit court is entitled to take that into account when making its credibility determinations. *Id.* at 137, 234 S.W.3d at 906.

In its order, the circuit court noted that the three witnesses present when Gus signed the affidavit were Baucum; Baucum's girlfriend, Anna Swallow; and Hank Griffin, a friend of Gus's who had hunted with him in the past. Baucum had arranged for Griffin to be a guest at the lunch to witness Gus's transfer of the Duck Club stock to Baucum. Baucum, a lawyer, prepared two documents transferring the Duck Club stock from Gus to Baucum. One document transferred the Duck Club stock to Baucum at Gus's death. The second document that Gus signed transferred the Duck Club stock to Baucum immediately.

After the lunch, Swallow brought out pictures of Gus and Baucum hunting at the Duck Club. Baucum, Swallow, and Griffin testified that Gus said he wanted Baucum to have his ownership interest in the Duck Club. Gus asked Baucum what he should do, and Baucum told Gus that he should transfer the stock to him now. Baucum took Gus, with Griffin following, to a notary public, and Gus signed the Affidavit transferring the Duck Club stock from Gus to Baucum. The next day, Gus went to the emergency room and was in the hospital for five days. Gus did not remember being in the hospital; he died on March 19, 2019.

The circuit court assessed the witnesses' credibility and considered the facts before it, including Gus's mental and physical health during the months before and after he signed the Affidavit. Specifically, the court found that the evidence presented at trial established the existence of a confidential relationship between Gus and Baucum because, in addition to the close familial relationship between them as father and son, Baucum held the power of attorney and thereby was attorney-in-fact for Gus at the time of the execution of the Affidavit. The court

6

held that as a result of the establishment of both procurement and a confidential relationship between Gus and Baucum, a rebuttable presumption of lack of capacity and undue influence arose. Given the record before us and our standard of review, we cannot say the circuit court erred in finding that Baucum had not rebutted the presumption.

Because we hold that the circuit court was correct in finding that Baucum had not rebutted the presumption of incapacity and undue influence, we decline to address his second appellate point in which he argues that after he rebutted the presumption of undue influence, the burden of proving undue influence and lack of capacity shifted back to his siblings. We affirm the direct appeal.

On cross-appeal, Marion, Martin, and Austin argue that the circuit court erred in appointing Baucum executor of Gus's estate. Gus's last will and testament appointed Baucum as executor of his estate. Less than two weeks after Gus passed away, Marion, Martin, and Austin brought suit, contending Baucum was unsuitable to serve as the executor of Gus's estate. Their entire argument centered on the conveyance of the Duck Club stock that is the subject of the direct appeal. They further argued that Marion and Martin should be appointed as the co-executors of Gus's estate instead of Baucum. The circuit court disagreed and "decline[d] to deviate from the provisions of Gus's will," noting that the Fulk siblings' "personal animosity does not render Baucum unsuitable to administer the estate."

Arkansas law calls for the executor named in a decedent's will to be the first person appointed by the court. Ark. Code Ann. § 28-48-101(a)(1) (Supp. 2021). Arkansas law allows probate courts to choose another personal representative if the person named in the decedent's will is "not qualified to serve." Ark. Code Ann § 28-48-101(b). Along with minors, those of

unsound mind, convicted felons, and unauthorized corporations, "not qualified to serve" can mean "[a] person whom the court finds unsuitable." Ark. Code Ann. § 28-48-101(b). "The statutory word 'unsuitable' gives wide discretion to a probate judge. Past maladministration of a comparable trust, bad character, misconduct, neglect of duty, or physical or mental incapacity, warrants a finding that an executor or administrator is unsuitable." *Ashley v. Ashley*, 2012 Ark. App. 236, at 12, 405 S.W.3d 419, 426 (citing *Quincy Tr. Co. v. Taylor*, 57 N.E.2d 573 (Mass. 1944)).

Circuit courts are given wide discretion in determining whether an individual is unsuitable to serve. *Ashley*, 2012 Ark. App. 236, at 12, 405 S.W.3d at 426; *Taylor v. Woods*, 102 Ark. App. 92, 102, 282 S.W.3d 285, 292 (2008) (statute provides that courts "may" render such a decision). The standard in reviewing a circuit court's decision is whether the court abused its discretion. *Taylor*, 102 Ark. App. at 103, 282 S.W.3d at 292. We cannot say the circuit court abused its discretion here.

In his will, Gus nominated Baucum as his executor. Baucum is a licensed attorney who practiced law in the private sector in Arkansas for three and a half years, and he has practiced military law for over twenty-six years. Baucum is a magna cum laude graduate of Harvard University and a colonel in the U.S. Army with over twenty-nine years of commissioned service. Baucum's military career has included service as a prosecutor, defense counsel, special assistant U.S. attorney, professor at the U.S. Army JAG School, principal legal advisor to a major general (two-star general), and principal legal advisor to a lieutenant general (three-star general). He has recently served as the Deputy Chief of Staff for Operations, Plans, and Training for the U.S. Army Reserve Legal Command, an organization commanded by a general that is made up of

about 20 percent of the legal personnel for the U.S. Army (active duty plus reserve), and he currently serves as the Command Judge Advocate with the 9th Mission Support Command.

At trial, Baucum testified that if named executor of his father's estate, he would retain counsel, gather the assets of the estate, and distribute the assets according to the plan of distribution approved by the court. Baucum also testified that he would hire tax advisers and follow their recommendations. Baucum explained that he is familiar with the importance of following the law and that the bulk of his career in the military has involved understanding, interpreting, and following laws, rules, and regulations. The evidence presented at trial demonstrates that Baucum is qualified, able, and fit to serve as executor of Gus's estate. The circuit court's decision appointing Baucum as executor is supported by proof, and it will not be disturbed on appeal. We affirm on cross-appeal.

Affirmed on direct appeal; affirmed on cross-appeal.

HARRISON, C.J., and HIXSON, J., agree.

*Barber Law Firm, PLLC*, by: *Mark W. Hodge* and *Rachel E. Hildebrand*, for appellant/cross-appellee.

*Rose Law Firm, a Professional Association*, by: *David S. Mitchell, Jr.*, and *Joseph Hall*, for appellees/cross-appellants.